# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| In re: | § | Case No. 19-40593-705 |
| | § | |
| JODY K. VALENTINE, | § | |
| | § | Chapter 7 |
| | § | |
| Debtor. | § | |
| _____ | § | |
| | § | |
| JODY K. VALENTINE, | § | |
| | § | |
| Plaintiff, | § | Adv. Proc. No. 19-04022-705 |
| | § | |
| v. | § | |
| | § | |
| CHRISTINE VALENTINE | § | |
| | § | |
| and | § | |
| | § | |
| ERIC WULFF, | § | |
| | § | |
| Defendants. | § | |

## <u>MEMORANDUM OPINION</u>

Domestic disputes that end up in bankruptcy court rarely end up there consensually, without great frustration from all parties, or with any party having followed every rule and law exactly. The instant Adversary Proceeding is no different. This is one of those very difficult situations that the Bankruptcy Code explicitly sought to avoid by outlining what narrow domestic issues may continue in state court without permission from the federal system.

If ordinarily, the "plaintiff is the master of his complaint," in this Adversary Proceeding, the creditor is the conductor of the collection effort. *Holmes Grp., Inc. v. Vornado Air Circulation Sys., Inc.*, 535 U.S. 826, 831, 122 S.Ct. 1889, 153 L.Ed.2d 13 (2002) (internal quotation marks omitted). The collection effort is the name of the train racing down the tracks of the court system; the engine is the debt— the driving force pulling the train—with the creditor ideally monitoring the internal forces and external barriers to the progress of the train. Each additional motion or pleading filed in a collection effort is yet another boxcar on the train. In this Adversary Proceeding, the collection effort barreled down the tracks of the State Court when the Defendants added another boxcar, and the external barrier, an automatic stay, was erected. Somewhere along the way the Defendants claim to have bailed out leaving a runaway collection effort train. At the very least, the Defendants were asleep at the switch, because the collection effort train blew through the barrier without even a warning whistle. The Defendants claim to have just stood by and watched as justice derailed resulting in the Debtor's incarceration.

Christine Valentine (the "Former Spouse") and Jody Valentine (the "Debtor") are divorced from one another. Eric Wulff (the "Attorney" together with the Former Spouse, the "Defendants", together with the Debtor, the "Parties") represented the Former Spouse at a hearing as domestic counsel on February 4, 2019 where the Attorney prevailed for his client and drafted an order, which the state court judge signed, confining the Debtor to the custody of St. Louis County for transferring control of the Real Estate by filing bankruptcy (the "Order & Commitment"). Order & Commit[]ment, *Valentine v. Valentine*, Case No. 10SL-DR00231-02 (Mo. Assoc. Cir. Ct. Feb. 4, 2019) *vacated by Disposition—Preemptory Writ Issued, State ex Jody Valentine Relator v. Julia Childrey Respondent*, Case No. ED107588 (Mo. App. E.D. Feb. 27, 2019). There is not a clean and tidy picture of what happened on

the fateful February 4 date, because the proceeding resulting in the Debtor's incarceration took place without any official record for this Court to reference. However, the hearing took place after the Debtor filed for bankruptcy protection. The hearing was the progression of a collection effort commenced by the Former Spouse through her agent, the Attorney, seeking payment on a debt incurred pre-petition. The hearing did not fall into any of the very narrow exceptions to the automatic stay, nor was it immediately continued or held in abeyance. Ultimately, the Order & Commitment issued, containing language requiring payment of a Pre-Petition Debt for his release. All of these collection efforts led to the Adversary Proceeding before the Court.

The Court deems the Debtor's request for relief as a request for a declaratory judgment in his favor and actual damages and punitive damages for violations of the automatic stay.

For the reasons set forth herein, the Court **FINDS** in favor of the Debtor that both the Former Spouse and the Attorney willfully violated the automatic stay, and therefore the Court will enter a separate judgment in favor of the Debtor in conformity with this Opinion.

## I. FACTS

### A. The Pre-Petition State Court Action

Debtor and Former Spouse dissolved their marriage on October 1, 2013 in the Circuit Court of St. Louis County, St. Louis, Missouri (the "State Court") in the case number 10SL-DR00231-02 (the "State Court Action"). In March 2017, the Debtor filed in the State Court Action a Motion to Modify his domestic support obligations. Between March 2017 and January 2018, several Motions for Contempt were filed in

the State Court Action by the Former Spouse through her counsel, the Attorney. All of the Motions for Contempt sought to collect funds from the Debtor previously ordered.

In January 2018, the Former Spouse's Motion for Contempt was heard and sustained at that time. The State Court entered an order, holding the Debtor in contempt of court for not paying past due support obligations (the "January 2018 Contempt Order") in the amount of $22,253.73 for child support and $41,750.00 for maintenance with interest accruing (the "Pre-Petition Debt"). The State Court, in the January 2018 Contempt Order required that the Debtor sell his house located at 747 Castle Tower Drive, Ellisville, Missouri (the "Real Estate") by March of 2018 and use the proceeds to satisfy the Pre-Petition Debt.

In the State Court Action, on the same day but by separate order, the State Court dismissed the Debtor's pending request to modify his domestic support obligations (the "Dismissal Order"). As part of the Dismissal Order, the State Court stated that should the Debtor fail to place the Real Estate on the market by March 1, 2018 a warrant would issue for the Debtor's arrest.

Although the Debtor marketed the Real Estate, the Debtor did not sell the Real Estate. In June 2018, the Attorney, on behalf of the Former Spouse, moved to appoint a real estate commissioner to force the sale of the Real Estate. Accordingly, on August 28, 2018, the State Court appointed a real estate commissioner to sell the residence, and the State Court stated in the same order that the Debtor was found in continued contempt for failing to sell the Real Estate and continuing failure to pay the Pre-Petition Debt.

4

On December 28, 2018, the State Court approved the sale of the Real Estate proposed by the real estate commissioner. On January 7, 2019, the Debtor filed with the Missouri Court of Appeals an appeal of an order related to the sale, which under Missouri law clouded the title. The proposed buyers of the residence then backed out of the sale.

On January 29, 2019, the Former Spouse filed a Second Motion for Contempt in the State Court Action, seeking the State Court to set a Show Cause Hearing, award the Former Spouse contempt sanctions against the Debtor for the Debtor's failure to sell the Real Estate, remit the proceeds from the sale of the Real Estate for payment on the Pre-Petition Debt, assess reasonable fees for the Attorney's efforts, and continue to hold the Debtor in contempt of court until the Debtor fully complied (the "Second Motion for Contempt"). An Order to Show Cause issued; the Show Cause Hearing was set for February 4, 2019.

From March 2018 to January 2019, the Debtor filed multiple documents with the State Court representing that he was too poor to afford certain filing fees. It is not clear from the record what standard the State Court uses to assess such a status, but the Debtor was denied in forma pauperis status at least once during that period.

**B. The Post-Petition State Court Incarceration**

Debtor commenced a case for bankruptcy relief under Chapter 7 of Title 11 of the United States Code (the "Bankruptcy Code"[1]) docketed as 19-40593-705 (the "Main Case") on February 1, 2019 (the "Petition Date"). On the Petition Date, the Debtor still owned and resided in the Real Estate. In the bankruptcy schedules filed

---

[1] Unless otherwise indicated, any reference to "section(s)" or "§[§]" shall refer to the indicated section[s] of the Bankruptcy Code.

with the Court, the Debtor asserted the value of the Real Estate to be $450,000.00; the Debtor further asserted that the Real Estate was subject to liens in the amount of $312,255.75 [Doc. No. 18].

Upon filing of the Main Case, all assets of the Debtor created a separate estate (the "Estate"). 11 U.S.C. § 541. Kristin Conwell was appointed Chapter 7 Trustee (the "Trustee") to administer the Estate [Doc. No. 5]. An injunction prohibiting continued collection efforts of pre-petition debts entered contemporaneously upon commencement of the Main Case. 11 U.S.C. § 362(a).

On the Petition Date, in the State Court Action, the Bankruptcy Counsel for the Debtor, Andrew Magdy, (the "Bankruptcy Counsel") filed Suggestions of Bankruptcy. The Bankruptcy Counsel for the Debtor also called the Attorney on the same day and left a voice message regarding the commencement of the Main Case.

On February 4, 2019, the Bankruptcy Counsel and the Debtor attended the hearing on the Second Motion for Contempt and regarding the continuation of the collection efforts on the Pre-Petition Debt brought by the Former Spouse and Attorney in the State Court Action (the "February 4, 2019 Hearing").

The Bankruptcy Counsel and the Attorney spoke shortly before the February 4, 2019 Hearing commenced. The Attorney accepted the Bankruptcy Counsel's statements that the Debtor had in fact commenced the Main Case, but the Attorney did not believe the Main Case impacted the Attorney's intentions for the February 4, 2019 Hearing. The Attorney is a long-time practitioner in domestic law, and he does not appear in front of the Court with any regularity. The Attorney does not claim any familiarity with the Court or the Bankruptcy Code.

6

The Attorney did not require the Former Spouse to attend, nor did the Attorney require the real estate commissioner to attend. The Attorney also accepted the article from the Bankruptcy Counsel which discussed the possible ramifications for incarceration on a prior contempt order for failure to pay a domestic support obligation after a bankruptcy commenced.

The Bankruptcy Counsel and the Attorney briefly spoke together to the state court judge in her chambers. The state court judge was informed about the commencement of the Main Case. No evidence exists that the Attorney requested a continuance of the February 4, 2019 Hearing during this conversation. The Bankruptcy Counsel was not counsel of record for the Debtor in the State Court, which limited the Bankruptcy Counsel's ability to speak and be heard during this conversation, and the February 4, 2019 Hearing.

The Court expresses disappointment with the lack of any transcript—written or audio—available from the February 4, 2019 Hearing that resulted in the incarceration of the Debtor. However, in the absence of a transcript, the Court looks to the submitted evidence and the testimony provided at trial to paint the picture of what took place on February 4, 2019. As some of the evidence directly contradicts other evidence, the Court made determinations regarding credibility and deference. As stated on the record, at trial, the Court also takes appropriate judicial notice of its record in its entirety and the publicly available information from the State Court.

The state court judge commenced the February 4, 2019 Hearing, and she confirmed with the Attorney that the collection effort on the Pre-Petition Debt was to proceed. The state court judge confirmed that funds remained outstanding on the Pre-Petition Debt ordered to be paid under the January 2018 Contempt Order. The state court judge confirmed that the Real Estate had not been sold, and the Main

7

Case had commenced. No evidence exists that the Attorney asked for a continuance at this time. No evidence exists that the Attorney asked for any ruling or order of the State Court to be held in abeyance pending stay relief from the Court. No evidence exists that the Attorney asked to modify the relief sought by the Second Motion for Contempt or other collection efforts.

The state court judge found in favor of the Former Spouse on the collection effort, and the Attorney asserted that he did nothing to prevent the state court judge from making any findings in favor of his client. The Attorney then drafted the Order & Commitment requiring the Debtor to be held in the custody of St. Louis County Jail until such time as he paid the funds required under the January 2018 Contempt Order.

The Order & Commitment stated in part (original case and punctuation not used):

> Order & Commit[]ment
> . . .
> On February 1, 2019 subsequent to demands to follow through with his offer to purge the [Debtor] voluntarily withdrew his offer to purge by preventing the sale of the [R]eal [E]state and transferring control of the [R]eal [E]state to the Federal Bankruptcy Court to stop the sale of the [R]eal [E]state which was [Debtor's] offer to purge[.]
>
> The [State] Court thereby orders [Debtor] confined under the Contempt Judgment of January 23, 2018 as he has withdrawn his offer to purge[.]
>
> [Debtor] to remain confined until he pays the sums due and owing in principal sum of $64,003.73 as of 1-22-18 or otherwise purges himself of contempt.

On February 5, 2019, the Debtor, through the Bankruptcy Counsel, filed Debtor's Emergency Ex Parte Motion Determining Property of the Estate and Confirming Application of the Automatic Stay (the "Determination Motion") [Doc. No. 7]. On February 7, 2019, the Court entered an Order Denying the Determination Motion (the "Denial Order") [Doc. No. 10]. The Debtor was released from incarceration on February 8, 2019.

### C. The Post-Petition Peremptory Writ

The Debtor, during his incarceration filed a petition for a writ of mandamus, docketed as *State ex Jody Valentine Relator v. Julia Childrey Respondent*, Case No. ED107588, Missouri Court of Appeals Eastern Division (the "Court of Appeals"), initially incorrectly naming the state court judge as respondent. However, on February 27, 2019, when the Court of Appeals issued its disposition, it corrected the misunderstanding of the Debtor on its own motion (the "Order of Vacatur"). *Disposition—Preemptory Writ Issued*, *State ex rel Jody Valentine rel v. Julia Childrey Res*, ED107588 (Mo. App. E.D. Feb. 27, 2019). The Order of Vacatur used the proper remedy of a writ of habeas corpus with the proper respondent being the Acting Director of the St. Louis County Department of Justice Services.  MO. SUP. CT. R. 91.07.

The Court of Appeals noted in its Order of Vacatur that the Order & Commitment failed to articulate how the State Court "convince[d] itself" that the Debtor had the ability to pay the amount of the Pre-Petition Debt. *C.S.G. v. R.G.*, 559 S.W. 3d 416, 422 (Mo. App. E.D. 2018) (quoting *Hopkins v. Hopkins*, 626 S.W.2d 389, 391 (Mo. App. E.D. 1981)). Under Missouri law, any contempt order sending a judgment debtor to incarceration must "contain specific findings regarding" the assets and liabilities of the judgment debtor's; these findings must be

9

as close to current on the day of incarceration as possible to reflect the judgment debtor's ability to pay. *Id.*

The Order of Vacatur highlighted that the Order & Commitment contained no specific findings, and instead the Order & Commitment mentioned several times the Debtor's bankruptcy and inability to purge himself of contempt. The Order of Vacatur then found the Order & Commitment facially invalid and ordered its vacatur. Moreover, the Court of Appeals found and explicitly stated that the incarceration of the Debtor was illegal and contrary to the law.

## D. The Adversary Proceeding

On February 22, 2019, the Debtor commenced the above-captioned adversary proceeding docketed at 19-04022-705 (the "Adversary Proceeding") [Adv. Pro. No. 1].

On March 29, 2019, the Debtor filed an Application Requesting a Clerk's Entry of Default [Adv. Pro. No. 8], which was entered on April 1, 2019. The Former Spouse filed a Motion to Set Aside the Clerk's Entry of Default [Adv. Pro. No. 18], which the Court denied on April 24, 2019 [Adv. Pro. No. 32].

On March 29, 2019, the Attorney filed a Motion to Dismiss the Adversary Proceeding [Adv. Pro. No. 9], and the Debtor filed his Response on April 22, 2019 [Adv. Pro. No. 28] which the Court denied on April 24, 2019 [Adv. Pro. No. 31].

On April 1, 2019, the Former Spouse filed her Answer to the Adversary Proceeding Complaint [Adv. Pro. No. 16] and her Motion to File Response Out of Time [Adv. Pro. No. 15], which the Court granted on April 24, 2019 [Adv. Pro. No. 30]. On April 11, 2019, the Former Spouse filed her Motion to Dismiss Adversary

10

Proceeding [Adv. Pro. No. 24], which the Court denied on April 24, 2019 [Adv. Pro. No. 33].

On May 22, 2019, the Debtor filed his Amended Complaint [Adv. Pro. No. 38]. On June 11, 2019, the Attorney filed his Answer to the Amended Complaint [Adv. Pro. No. 39]. On June 13, 2019, the Former Spouse filed her Answer to the Amended Complaint. [Adv. Pro. No. 40].

On November 19, 2019, the Debtor, the Attorney, and the Former Spouse all appeared for trial and testified. No Party submitted any post-trial briefing. The matter is fully submitted and ready for adjudication.

## II. PRELIMINARY MATTERS

This Court finds that it has jurisdiction under 28 U.S.C. § 151, 157, and 1334 and Local Rule 81-9.01(B) of the United States District Court for the Eastern District of Missouri. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (2016). Venue is proper in this District under 28 U.S.C. § 1409(a).

Plaintiff affirmatively consented to the authority of the Court. Both Defendants received notice that failure to respond to the Summons in this Adversary Proceeding would result in a determination that they consented to the authority of the Court. Neither Defendant raised an objection to the authority of the Court. Therefore, the Court has both the authority to enter judgment on the matter and the consent of all Parties to an entry of judgment.

The Court acknowledges that there is a circuit split pending resolution before the Supreme Court of the United States regarding whether refusing to turn over an asset of the estate after the bankruptcy commences is a violation of the automatic

stay. *City of Chicago, Illinois v. Fulton* (*In re Fulton*), 926 F.3d 916 (7th Cir. 2019), *cert. granted*, 2019 WL 6880702 (U.S. Dec. 18, 2019) (No. 19-357). However, this matter does not involve the control of estate assets subject to turnover, and therefore, this Adversary Proceeding may be resolved without waiting for the Supreme Court to rule in *Fulton.*

As detailed below, the *Rooker-Feldman* doctrine does not deprive the Court of subject matter jurisdiction over this Adversary Proceeding.

### III. LAW

#### A. Rooker-Feldman

The *Rooker-Feldman* doctrine provides that lower federal courts cannot exercise subject-matter jurisdiction over matters that "seek review of, or relief from, state court judgments." *Caldwell v. DeWoskin*, 831 F.3d 1005, 1008 (8th Cir. 2016) (quoting *Hageman v. Barton*, 817 F.3d 611, 614 (8th Cir. 2016)). However, when a plaintiff seeks damages for alleged collection efforts that violated the automatic stay, including a creditor's efforts to collect on a pre-petition debt by "seeking and executing the [state contempt orders]" after the automatic stay is in place, the *Rooker-Feldman* doctrine is not implicated. *Caldwell*, 831 F.3d at 1009 (quoting *Riehm v. Engelking*, 538 F.3d 952, 965 (8th Cir. 2008)).

#### B. Preclusion

After the *Rooker-Feldman* analysis is complete, the Court must next look to the preclusion doctrine. *Caldwell*, 831 F.3d at 1008 (citing *Exxon Mobil Corp. v. Saudi Basic Industries Corp.*, 544 U.S. 280, 284, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005)). If a lower court has fully litigated an issue, and there is a final judgment on the matter the Court must give the judgment full faith and credit. 28 U.S.C. § 1738.

An order or judgment that has been vacated or is void *ab initio* is subject to collateral attack and not entitled to full faith and credit. *In re Osage Water Co.*, Case No. 17-42759, Adv. Pro. No. 17-02010, 2018 WL 4440694 *1, *5 (Bankr. W.D. Mo. 2018) (citing *In re Gruntz*, 202 F.3d 1074, 1082 n.6 (9th Cir. 2000)).

### C. Automatic Stay

#### 1. *Generally*

When there is a possible violation of an automatic stay, two determinations are needed. First, is the matter something that would have been stayed absent an exception? And, secondly, does an exception under § 362(b) or other applicable law apply?

The filing of a bankruptcy "operates as a stay, applicable to all entities, of the commencement or continuation … of a judicial, administrative, or other action or proceeding against the debtor … to recover a claim against the debtor that arose before the commencement of the case under this title .…" 11 U.S.C. § 362(a). Without question the force of the automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws" of this country. *Midlantic Nat'l Bank v. N.J. Dep't of Envtl. Prot.*, 474 U.S. 494, 503 106 S.Ct. 755, 88 L.Ed.2d 859 (1986) (quoting S. Rep. No. 95-989, at 54-55 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5840, 5963, 6296); *General Motors Co. v. Briggs Transp. Co. (In re Briggs Transp. Co.)*, 780 F.2d 1339, 1343 (8th Cir. 1985) (quoting same language). *See also LaBarge v. Vierkant (In re Vierkant)*, 240 B.R. 317, 320 (8th Cir. BAP 1999) ("The automatic stay is among the most basic of debtor protections under bankruptcy law") (quoting *Soares v. Brockton Credit Union*, 107 F.3d 969, 975 (1st Cir. 1997)).

Numerous circuit courts describe the automatic stay as a very broad protection that "stops *all* collection efforts, *all* harassment, and *all* foreclosure actions. It permits the debtor to attempt a repayment or reorganization plan, or simply to be relieved of the financial pressures that drove him into bankruptcy." *E.g., United States v. Robinson (In re Robinson)*, 764 F.3d 554, 559 (6th Cir. 2014) (quoting S. Rep. No. 95-989 at 54-55 (1978), H.R. Rep. No. 95-959 at 340 (1977), 1978 U.S.C.C.A.N. at 5840, 5963, 6296-97) (emphasis added); *Kimbrell v. Brown*, 651 F.3d 752, 755 (7th Cir. 2011) (quoting the same language); *Schwartz v. United States (In re Schwartz)*, 954 F.2d 569, 571 (9th Cir. 1992) (quoting the same language); *see also Univ. Med. Ctr. v. Sullivan (In re Univ. Med. Ctr.)*, 973 F.2d 1065, 1074 (3d Cir. 1992) (quoting the same language). The automatic stay is very broad, because its purpose "aims to prevent damaging disruptions to the administration of a bankruptcy case." *Taggart v. Lorenzen*, 587 U.S. ---, 139 S.Ct. 1795, 1804, 204 L.Ed.2d 129 (2019).

The automatic stay becomes effective immediately upon the commencement of a bankruptcy case. *Garden v. Central Nebraska Housing Corp.*, 719 F.3d 899, 906 (8th Cir. 2013); *see also Gruntz*, 202 F.3d at 1081; *see also Carter v. First Nat'l Bank of Crosset (In re Carter)*, 502 B.R. 333, 336 (8th Cir. BAP 2013). No formal order of automatic stay is required to be issued under federal law, as the automatic stay issues by operation of law. 11 U.S.C. § 362(a); *see also Robinson*, 764 F.3d at 558-59 (the commencement of a bankruptcy case triggers specific statutory protections automatically); *see also Gruntz*, 202 F.3d. at 1081 (the automatic stay is a self-executing provision under federal law). The stay is truly *automatic* upon filing of the petition. *Briggs*, 780 F.2d at 1343.

14

Collection efforts taken in violation of the automatic stay are void *ab initio*, even if they occur in the course of a judicial proceeding. *Kalb v. Feurstein,* 308 U.S. 433, 439, 60 S.Ct. 342, 84 L.Ed. 370 (1940) (citing *Vallely v. Northern Fire & Marine Ins. Co.*, 254 U.S. 348, 353-54, 41 S.Ct. 116, 65 L.Ed. 297 (1920)); *see also Raymark Industries, Inc., v. Lai (In re Raymark Industries, Inc.),* 973 F.2d 1125, 1131 (3d Cir. 1992) ("actions taken in violation of the automatic stay are void *ab initio*"); *Schwartz*, 954 F.2d at 571 ("Our decision today clarifies this area of law by making clear that violations of the automatic stay are void not voidable."); *Interstate Com. Comm'n v. Holmes Transp., Inc.*, 931 F.2d 984, 987 (1st Cir. 1991) ("Judicial actions and proceedings as well as extrajudicial acts, in violation of the automatic stay are generally void and without legal effect."); *see also Vierkant*, 240 B.R. at 325 (8th Cir. BAP 1999); *see also In re Burke,* 147 B.R. 955, 959 (Bankr. W.D.Mo. 1992); *see also Lowry v. McNeil Corp. (In re Lowry)*, 25 B.R. 52, 56 (Bankr. E.D.Mo 1982). Missouri state courts even recognize the obligation to cede to a bankruptcy court's final determination on the automatic stay. *Suedkamp v. Taylor*, 578 S.W.3d 408, 416 (Mo. App. E.D. 2019); *see also Crowley v. Crowley*, 715 S.W.2d 934, 938 (Mo. App. S.D. 1986).

### 2. *Statutory Exceptions*

The exceptions found under § 362(b) are extremely narrow in their scope. Section 362(b)(1) provides that there is an exception for "the commencement or continuation of a criminal action proceeding against the debtor." *Armstrong v. Republic Realty Mortg. Corp.*, 631 F.2d 1344, 1351-52 (8th Cir. 1980) (applying Missouri law). In addition, § 362(b)(2) provides an exception in "the commencement or continuation of a civil action or proceeding" for a variety of different narrowly construed scenarios. 11 U.S.C. § 362(b)(2). Also, § 362(b)(2) creates an exception

for the collection of domestic support obligations and garnishments. However, none of these exceptions apply in this case.

Section 362(b)(2)(A) only applies to (1) the establishment of paternity; (2) the *establishment or modification* of an order for domestic support obligations; (3) child custody or visitation; (4) dissolution of a marriage, except to the extent that such proceedings seeks to determine the division of property that is property of the estate; or (5) domestic violence. 11 U.S.C. § 362(b)(2)(A) (emphasis added). These exceptions must be read narrowly in order to protect the debtor. *Stringer v. Huet (In re Stringer)*, 847 F.2d 549, 552 (9th Cir. 1988).

Section 362(b)(2)(B) allows for "the collection of a domestic support obligation from property that is *not* property of the estate." 11 U.S.C. § 362(b)(2)(B) (emphasis added). Therefore, an order, finding of contempt, or demand for payment of a domestic support obligation dependent on the use of property of the estate does not fall within this exception.

Section 362(b)(2)(C) states, "with respect to the withholding of income that is property of the estate or property of the debtor for payment of a domestic support obligation under a judicial or administrative order or a statute." 11 U.S.C. 362(b)(2)(C).

*3.   Non-Statutory Exceptions*

If a state court issues a contempt order that predominantly focuses on upholding a previous order of that state court, it may not always violate the automatic stay. *Lowery v. McIlroy & Millian (In re Lowery)*, 292 B.R. 645, 649-50 (Bankr. E.D.Mo. 2003). However, a contempt order or a civil confinement order, focused on

16

receiving funds to satisfy a money judgment, "pursue a 'collection motive,'" or to excessively embarrass or harass a judgment debtor does violate the automatic stay. *Rook v. Rook (In re Rook)*, 102 B.R 490, 493 (Bankr. E.D.Va. 1989) (quoting *Int'l. Distribution Ctrs., Inc. v. Walsh Trucking Co. Inc. (Int'l. Distribution Ctrs. Inc.)*, 62 B.R. 723, 729-30 (Bankr. S.D.N.Y. 1986)). To make this determination, a bankruptcy court must look at the totality of the circumstances. *Lowery*, 292 B.R. at 650 (citing *Lori v. Lori (In re Lori)*, 241 B.R. 353, 355 (Bankr. M.D.Pa. 1999)).

### 4. *Damages*

A party claiming damages for a stay violation must establish that (1) a violation of the automatic stay occurred; (2) the violation was committed willfully; (3) the violation caused actual damages; and if the plaintiff seeks punitive damages (4) that the appropriate circumstances exist to award punitive damages. 11 U.S.C. § 362(k); *Garden*, 719 F.3d at 906-07. An attorney and a creditor represented by the attorney may be held jointly and severally liable for violations. *Gray v. ZB NA (In re Gray)*, 567 B.R. 841, 843 (Bankr. W.D. Wash. 2017); *see also Bailey v. Davant (In re Bailey)*, 428 B.R. 694, 700 (Bankr. N.D. W.Va. 2010). The debtor must demonstrate each element by a preponderance of the evidence. *Carter*, 502 B.R. at 336. However, the debtor need not establish that the creditor or the attorney had any intent to violate the automatic stay. *Id.* (citing *Associated Credit Servs., Inc. v. Campion (In re Campion)*, 294 B.R. 313, 316 (9th Cir. BAP 2003)).

Evidence for each genuine injury claimed must be entered into evidence. *Forshee v. Waterloo Industries, Inc.*, 178 F.3d 527, 531 (8th Cir. 1999). Damages associated with emotional distress "require proof of evidence of the nature and extent of emotional harm caused by the alleged violation." *Browning v. President Riverboat Casino-Missouri, Inc.*, 139 F.3d 631, 636 (8th Cir. 1998).

17

The good-faith belief of a creditor that the automatic stay was not violated is not relevant to the determination on if actual damages must be awarded for a willful violation of the automatic stay. *Morris v. Peralta (In re Peralta)*, 317 B.R. 381, 389, (9th Cir. BAP 2004); *Campion*, 294 B.R. at 316; *In re Risner*, 317 B.R. 830, 835 (Bankr. D. Idaho 2004). Further, a creditor may not assert good-faith reliance on the advice of counsel as a defense to actual damages for a willful violation of the automatic stay. *United States v. Ketelsen (In re Ketelsen)*, 880 F.2d 990, 993 (8th Cir. 1989); *see also Heghmann v. Indorf (In re Heghmann)*, 316 B.R. 395, 406 (1st Cir. BAP 2004); *In re Daniels*, 316 B.R. 342, 352 (Bankr. D. Idaho 2004).

Punitive damages are recoverable in "appropriate circumstances" which mandate egregious, deliberate, or intentional misconduct by the violating creditor or his or her agent. *Ketelsen*, 880 F.2d at 993. A court must also consider the creditor's ability to pay and the nature's misconduct when setting the amount of punitive damages. *Armstrong*, F.2d at 1351-52.

**D. Creditors' Obligations**

When creditors require clarification on their obligations under the Bankruptcy Code that clarification must come from the Court supervising the bankruptcy. *McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 191-92 (1949). The Eighth Circuit already recognizes that creditors have an affirmative duty to cease collection efforts immediately upon commencement of a bankruptcy case. *Knaus v. Concordia Lumber Co. (In re Knaus)*, 889 F.2d 773, 775 (8th Cir. 1989). Any failure in fulfilling an affirmative duty, by the Eighth Circuit's previous determination, is a violation of the automatic stay. *Id*. One of our Minnesota sister courts highlighted that the "universal nature" of § 362 prevents "evasive" and "disingenuous" arguments that

18

creditors may sit and do nothing to cease the collection efforts commenced by the creditors prior to the bankruptcy filing. *Atkins v. Martinez (In re Atkins)*, 176 B.R. 998, 1006 (Bankr. D.Minn. 1994). Another sister court in Arkansas, asserts that a creditor's attorney "must do everything he can to halt" a collection proceeding. *O'Connor v. Methodist Hospital of Jonesboro, Inc. (In re O'Connor)*, 42 B.R. 390, 392 (Bankr. E.D.Ark. 1984). Therefore, creditors that fail to affirmatively act to stop collection efforts that the creditors themselves put into motion may be liable for violations of the automatic stay.

Other appellate and bankruptcy courts also assert the obligation of creditors to affirmatively act to prevent violations of the automatic stay, and these courts often assess damages for the violations against the creditors. *E.g., Wohleber v. Skurko (In re Wohleber)*, 596 B.R. 554, 572 (6th Cir. BAP 2019) (failure to prevent the incarceration after a contempt hearing for delinquent payments under domestic court orders); *see also In re Webb*, 472 B.R. 665, 2012 WL 23229051 *1, *5-*7 (6th Cir. BAP 2012) (failure to release a *lis pendens* on real property); *see also In re Dougherty-Kelsay*, 601 B.R. 426, 448 (Bankr. E.D.Ky. 2019) (failure to modify or withdraw a contempt motion in domestic proceedings after commencement of a bankruptcy); *see also In re Ragone*, 2019 WL 2202941, Case No. 13-51335, Adv. Pr. No. 18-03070, *1, *13 (Bankr. N.D. Ohio May 21, 2019) (failure to terminate a wage garnishment); *see also In re Witham*, 579 B.R. 787, 793 (Bankr. E.D. Ky. 2017) (failure to stop a post-petition bank account debit for a prepetition debt that was not child support related); *see also In re Humbert*, 2016 WL 4508186 *3 (Bankr. N.D. Ohio Aug. 26, 2016) (failure to dismiss an eviction action); *see also In re Smith*, 170 B.R. 111, 116 (Bankr. N.D. Ohio 1994) (failure to return funds coerced by improper disconnection of utilities); *see also Ledford v. Tiedge (In re Sams)*, 106 B.R. 485, 490 (Bankr. S.D. Ohio 1989) (failure to prevent conclusion of foreclosure

action); *see also In re Dungey*, 99 B.R. 814, 816 (Bankr. S.D. Ohio 1989) (failure to return improperly garnished wages); *see also Elder v. City of Thomasville, Georgia (In re Elder)*, 12 B.R. 491, 494 (Bankr. M.D. Ga. 1981) (failure to dismiss or delay garnishment proceedings). The failure of a creditor to act to remedy its violations and cease continuing violations are found to be equally problematic and unacceptable to these courts. *Wohleber*, 596 B.R. at 572; *Elder*, 12 B.R. at 494 (asserting that "[n]o action is action to thwart the effectiveness of the automatic stay"). For decades, bankruptcy courts have rejected the idea that creditors may shirk their responsibilities to stop judicial proceedings that serve the primary purpose of a collection effort that the creditor set into motion. *Dungey*, 99 B.R. at 817 (describing the argument that a creditor can passively watch collection efforts that creditor set into motion as "patently absurd"); *see also Mitchell v. Quality Plant Services, Inc. (In re Mitchell)*, 66 B.R. 73, 75 (Bankr. S.D. Ohio 1986) (stating that if a creditor "is enjoined from continuing a judicial proceeding. . . [a creditor] is obliged to discontinue it"); *see also Matter of Dennis*, 17 B.R. 558, 559-60 (Bankr. M.D.Ga. 1982).

Moreover, creditors are obligated to refrain from the attempt to punish debtors for pursuing their rights under the Bankruptcy Code. *Knaus*, 889 F.2d at 776. Such attempts to punish debtors, may give rise to the appropriate circumstances necessary to support punitive damages. *Id.*

## IV. DISCUSSION

### A. *Rooker-Feldman* Doctrine Does Not Prevent the Court from Determining if a Stay Violation Occurred

The Court holds the jurisdiction to determine that a stay violation occurred, because the challenge is not to the Pre-Petition Debt, but to the collection efforts "in

seeking and executing" the Order & Confinement. *Caldwell,* 831 F.3d at 1009 (8th Cir. 2016) (quoting *Riehm*, 538 F.3d at 965). This Adversary Proceeding is not a direct appeal of the State Court. The State Court's Order & Confinement was vacated on appeal much like the state court's Judgment of Contempt in *Caldwell*. 831 F.3d at 1009. The Debtor focuses on the Defendants' post-Petition Date efforts to collect on the Pre-Petition Debt taken in State Court that violated federal bankruptcy law. The Court will not attempt to alter or interfere with the amount stated to be the Pre-Petition Debt, as that was rightly the purview of the State Court. However, the post-Petition Date activities of the Defendants to progress on the efforts to collect on the Pre-Petition Debt are the purview of this Court.

Here, the Debtor seeks compensation for injuries alleged to be caused by post-Petition Date collection efforts of the Defendants, just like the debtor in *Caldwell*. *Id.* Therefore, the jurisdiction of the Court to decide this matter is sound.

The Court **FINDS** that the *Rooker-Feldman* doctrine does not apply to the Adversary Proceeding before it.

### B. The Court is Not Precluded by the Order & Confinement

Typically, under ordinary doctrinal rules of preclusion, when a domestic case order enters the bankruptcy world a preclusion analysis must be completed. *Caldwell*, 831 F.3d at 1008 (citing *Exxon Mobil*, 544 U.S. at 284). Full faith and credit are due to valid, final judgments arising from state court proceedings that come into bankruptcy. 28 U.S.C. § 1738.

It is important in this instance, to make it clear what State Court order is at issue. The January 2018 Contempt Order which set forth the amount of the Pre-

Petition Debt is a valid, final order. The collection efforts that were part of the February 4, 2019 Hearing and the resulting Order & Confinement which by its own terms sought to move forward on to coerce payment the Pre-Petition Debt are at issue. The Order & Confinement never became final, and therefore, the Order & Confinement is not subject to any protections of preclusion. *Osage Water*, 2018 WL 44406494 at *5 (citing *Gruntz*, 202 F.3d at 1082 n.6).

Missouri does not overturn civil contempt rulings absent clear abuses of discretion. *C.S.G.*, 559 S.W.3d at 422 (citing *Ream-Nelson v. Nelson*, 333 S.W.3d 22, 28 (Mo. App. W.D. 2010)). The Court of Appeals deemed the Order & Confinement *facially invalid* in its Order of Vacatur. A vacated order no longer has any force of law. Therefore, no findings of fact or conclusions of law stated in the Order & Confinement could potentially bind the Court. Any reference to the Order & Confinement stand to provide texture as to what occurred that violated the automatic stay and how these violations happened.

The Court **FINDS** the Order & Confinement never became final, because the Court of Appeals overturned the rulings and ordered its vacatur.

The Court **FINDS** it is not precluded from ruling on the issue of if there was a violation of the automatic stay by any determination made in the Order & Confinement.

### C. The State Court Proceeding that Resulted in Plaintiff's Confinement Violated the Automatic Stay

1. *The Automatic Stay Commenced Contemporaneously with the Filing of the Main Case*

Now that the Court established it has the right to proceed, because there is no *Rooker-Feldman* or preclusive concern, the Court considers: did a violation of the automatic stay occur? The first determination the Court must make is that the automatic stay was in effect at the time that the collection effort(s) took place, because the automatic stay "aims to prevent damaging disruptions to the administration of a bankruptcy case." *Taggart*, 139 S.Ct. at 1804.

The Debtor commenced the Main Case on February 1, 2019. By operation of law, the automatic stay went into effect immediately at that time. *Garden*, 719 F.3d at 906; *Gruntz*, 202 F.3d at 1081; *Carter*, 502 B.R. at 336. Even though the formal notice did not issue until February 6, 2019, the injunction against continuing collection efforts on the Pre-Petition Debt was in full force on the Petition Date. 11 U.S.C. § 362(a); *Robinson*, 764 F.3d at 558-59; *Gruntz*, 202 F.3d at 1081. As the name suggests, the protections of the automatic stay trigger automatically. *Garden*, 719 F.3d at 906; *Carter*, 502 B.R. at 336; *Briggs*, 780 F.2d at 1343. The collection efforts here took place at the February 4, 2019 Hearing through February 8, 2019 under the facially invalid Order & Confinement. The collection efforts sought payment on the Pre-Petition Debt. The Debtor's freedom was contingent on such payment. The Defendants never sought permission of the Court for the collection efforts in the State Court Action, so the automatic stay was in effect for the entirety of the time the collections efforts occurred.

The Court **FINDS** that the automatic stay went into effect immediately upon commencement of the Main Case on February 1, 2019.

The Court **FINDS** that the collection efforts of the February 4, 2019 Hearing and under the Order & Confinement took place while the automatic stay was in effect.

The force of the automatic stay is not absolute as some limited exceptions do apply; however, the exceptions are construed narrowly to allow for the broad protection intended by Congress. *Id.* Congressional intent clearly was to allow for broad protections from the automatic stay. *Stringer*, 847 F.2d at 552. The Court now turns to the question on if any of those exceptions apply.

    2. *The February 4, 2019 Hearing and Order & Confinement Were Not Excepted from the Automatic Stay Under Any Statutory Provision*

There is no statutory exception to the automatic stay that applies to the instant Adversary Proceeding.

The instant Adversary Proceeding deals with a civil contempt matter arising out of a domestic relations case in the State Court. Like the debtor in *Wohleber*, the February 4, 2019 Hearing was civil, and therefore subject to the automatic stay. 596 B.R. at 571. Missouri uses a statutory scheme to outline the offenses that give rise to the acts warranting incarceration under criminal contempt. MO. REV. STAT. § 476.110. There is nothing alleged in the record that indicates this was a criminal contempt proceeding, and all Parties have referred to the matter as a civil contempt proceeding. *Cf. Decision, In re Golan*, 19-75598-REG, 3 (Bankr. E.D.N.Y. Dec. 19, 2019) ECF No. 40.

The Court **FINDS** the exception to the automatic stay of § 362(b)(1) does not apply, because the February 4, 2019 Hearing was not a criminal contempt proceeding.

Just like a property division awarded in a domestic relations case before the filing of the bankruptcy petition is a debt of the debtor, the Pre-Petition Debt

24

consisting of child support and maintenance arrearages is a debt of this Debtor. *Long v. Donahue (In re Long)*, 148 B.R. 904, 907-08 (Bankr. W.D. Mo. 1992). Therefore, when the commencement or continuation of a proceeding to collect a property division award in a domestic relations court would be in violation of the automatic stay unless there is an applicable exception under § 362(b), the same would be true for the similarly situated Pre-Petition Debt. *Wohleber*, 596 B.R. at 567-69. The facts do not suggest that this was an "establishment or modification of an order for domestic support obligations" or that it "concern[ed] child custody or visitation." 11 U.S.C. § 362(b)(2)(A)(ii)-(iii). The Debtor's request to modify his domestic support obligations was denied in January 2018 by a separate order than the one referenced at the February 4, 2019 Hearing. The determination of what was owed for domestic support obligations was already made by the State Court. The Pre-Petition Debt represents past due funds that had already accrued. At the February 4, 2019 Hearing, there was no active attempt to change the amount of the Pre-Petition Debt. No, the facts clearly indicate that the February 4, 2019 Hearing sought to force the Debtor to sell the Real Estate—property of the Estate—to pay the full amount of the Pre-Petition Debt or otherwise pay the full amount of the Pre-Petition Debt. The Pre-Petition Debt included child support and maintenance arrearages, but this did not establish a new obligation to pay or modify previous obligations regarding the Debtor's domestic support obligations. Therefore, the collection efforts taken at the February 4, 2019 Hearing do not qualify as an exception to the automatic stay under § 362(b)(2)(A).

The Court **FINDS** the exceptions to the automatic stay of § 362(b)(2)(A) do not apply, because the domestic support obligations had already been determined to be the Pre-Petition Debt, and the Debtor's last pre-Petition Date modification request

with the State Court had already been denied. No other evidence was put before the Court to allege the other exceptions under this section might apply.

The Bankruptcy Code and the case law clearly show that collections of child support obligations from non-estate property are permissible. 11 U.S.C. § 362(b)(2)(B); *see also In re Bezoza*, 271 B.R. 46, 51 (Bankr. S.D.N.Y. 2002). If the creditor attempts to reach estate property, even for satisfying child support obligations, the automatic stay has been violated. 11 U.S.C. § 362(b)(2); *see also Matter of Daugherty*, 117 B.R. 515, 517 (Bankr. D. Neb. 1990); *In re Gianakas*, 112 B.R. 737, 741 (W.D.Pa. 1990).

The concept of what encompasses property of the estate is very broad. The Bankruptcy Code requires that "all legal or equitable interests of the debtor in property" be included in the Estate. 11 U.S.C. § 541.

On the Petition Date, the Debtor still held a legal and equitable interest in the Real Estate, and he resided in the Real Estate. Therefore, the Real Estate was property of the Estate. *Id.* The Defendants acknowledged as much. The facially invalid Order & Confinement even acknowledged the Real Estate was under the control of the Trustee. The Order & Confinement demanded payment of the Pre-Petition Debt, but it did not identify what non-Estate property would be used to satisfy the Pre-Petition Debt. Instead, there is no record of the February 4, 2019 Hearing that points to non-Estate property identified for use to make payments. Since the Defendants sought the sale of the Real Estate or otherwise full payment of the Pre-Petition Debt without identifying the non-Estate property available for Debtor's use, the Defendants violated the automatic stay.

26

The Court **FINDS** that the February 4, 2019 Hearing and Order & Confinement sought payment of the Pre-Petition Debt through Estate property.

The Court **FINDS** that the collection efforts taken at the February 4, 2019 Hearing and under the Order & Confinement violated the automatic stay, because the exception under § 362(b)(2)(B) cannot apply when the State Court fails to specifically identify non-Estate property available for payment of the Pre-Petition Debt.

The Court **FINDS** that the exception to the automatic stay of § 362(b)(2)(C) does not apply, because there is no evidence before the Court indicating that the February 4, 2019 Hearing or the Order & Confinement involved a withholding order or a garnishment order.

The Court **FINDS** that no statutory exception to the automatic stay applies to the collection efforts taken by the Defendants relating to the February 4, 2019 Hearing and the Order & Confinement.

3. *The February 4, 2019 Hearing and Order & Confinement Were Not Excepted from the Automatic Stay Under Any Non-Statutory Provision*

The Defendants seek the protections of the non-statutory exception alleging the February 4, 2019 Hearing focused on upholding the dignity of the court referenced in *Lowery*. 292 B.R. at 649. A review of the totality of the circumstances demonstrate that the primary purpose of the February 4, 2019 Hearing and the Order & Confinement was to force the Debtor to pay the Pre-Petition Debt through coercive incarceration.

First, the evidence points to forcing payment of the Pre-Petition as the State Court's primary purpose in issuing the Order & Confinement—not to uphold the dignity of its prior order. The court in *Wohleber* stated that the record lacked "any evidence that the purpose of the confinement was to uphold the court's dignity." 596 B.R. at 571. Instead, the evidence there indicated that the hearing and subsequent incarceration took place to "coerce [the debtor] into paying the property settlement." *Id. cf. Decision, Golan*, 3, ECF No. 40 (where the state court made specific findings consistent that the hearing was criminal in nature, and the hearing itself was not a violation of the automatic stay, but the sentence of the state court requiring payment of a pre-petition obligation to a creditor is a violation of the stay rendering the order void). Here, the situation was much like *Wohleber*. 596 B.R. at 571. There is simply no record to demonstrate that the February 4, 2019 Hearing was anything beyond an attempt to collect the Pre-Petition Debt. Missouri law further requires the Court to recognize the February 4, 2019 Hearing as financially coercive, because the February 4, 2019 Hearing and resulting Order & Confinement had the purpose "'to coerce compliance with the relief granted.'" *Garner v. Hubbs*, 17 S.W.3d 922, 929 (Mo. App. S.D. 2000) (quoting *State ex rel. Chassaing v. Mummert*, 887 S.W.2d 573, 578 (Mo. 1994) (en banc)). The relief granted in the January 2018 Contempt Order was payment of the Pre-Petition Debt and the sale of the Real Estate; therefore, accessing that relief was the purpose of Order & Confinement. Imprisonment is only appropriate after the trial court "convince[s] itself" that the Debtor had the ability to make payment; the Order of Vacatur stated found this did not occur. *C.S.G.*, 559 S.W.3d at 422 (quoting *Hopkins*, 626 S.W.2d at 391). Without this finding, the Debtor never held the "key to the jailhouse door" required by Missouri law. *C.S.G.*, 559 S.W. 3d at 422 (quoting *State ex rel. Barth v. Corrigan*, 870 S.W. 2d 458, 459 (Mo. App. E.D. 1994)). Missouri law prohibits a trial court from relying on an alleged contemnor's failure to produce evidence of an affirmative defense or failure

to assert an inability to pay prior to ordering incarceration. *C.S.G.*, 559 S.W. 3d at 422; *see also Lyons v. Sloop*, 40 S.W. 3d 1, 10 (Mo. App. W.D. 2001). However, the Debtor did assert an inability to pay, because he made the State Court aware of the commencement of the Main Case.

Moreover, like the debtor in *Wohleber*, the evidence before the Court shows that the state court judge primarily focused on the Debtor's failure to pay the Pre-Petition Debt in a manner agreeable to the State Court. 596 B.R. at 571-72. The state court judge's irritation with the Debtor is not the focus of our inquiry, but the focus on the failure to pay highlights the coercive nature of the February 4, 2019 Hearing and incarceration to move forward on the collection of the Pre-Petition Debt. The February 4, 2019 Hearing was set as an Order to Show Cause, on the Second Motion for Contempt of the Former Spouse. The Second Motion for Contempt sought significant relief including requiring payment of the Pre-Petition Debt, the sale of the Real Estate, the assessment of monetary sanctions, the assessment of costs and attorneys' fees, the Debtor to be remain in civil contempt based on the January 2018 Contempt Order, and to incarcerate the Debtor if all of the amounts were not rendered. The Order to Show Cause indicated that the Debtor had to appear at the February 4, 2019 Hearing, and that all of the requested relief of the Second Motion for Contempt was possible.

The Order & Confinement did not even comply with state law. The Order of Vacatur found the Order & Confinement facially invalid. The Order & Confinement did not contain sufficient information indicating how the State Court believed the Debtor had the ability to purge himself of contempt, especially in light of the Main Case. *C.S.G.,* 559 S.W. 3d at 422. Missouri law requires that the movant in a contempt proceeding put on sufficient evidence regarding the alleged contemnor's

assets and liabilities. *Id.* The Attorney would have been the movant at the February 4, 2019 Hearing, and the Attorney testified to the Court that he put on no such evidence. As the drafting party, the Attorney put no such language in the Order & Confinement. Missouri law requires specific findings that the party to be held in contempt and confined has the ability to make payments, or that the party has "intentionally and contumaciously placed himself in a position" to not comply. *Huber v. Huber*, 649 S.W.2d 955, 958 (Mo. Ct. App. E.D. 1983). The language of the Order & Confinement discussed the Debtor's decision to file bankruptcy.

Unlike the situation in *Lowery*, the Court cannot give any deference to the minimal findings in the Order & Confinement, because the Order & Confinement is facially invalid and vacated. Furthermore, the findings of the Order & Confinement sought to use the Debtor's access of the Bankruptcy Code protections as a sword to cut him down, and the State Court was the improper venue for such a determination. Unlike the situation in *Golan*, where the state court provided "thoughtful analysis" on why it proceeded with the hearing, before this Court there is no such analysis from the State Court. *Decision, Golan*, 1-2, ECF No. 40. (the bankruptcy court determined that the analysis supported that the hearing did not violate the stay, but that the sentencing of the debtor was a stay violation). Here, the deposition testimony submitted of the state court judge that oversaw the February 4, 2019 Hearing is not persuasive given the circumstances surrounding the Order & Confinement. The state court judge might have been acting within her authority to determine if she had jurisdiction over the January 2018 Contempt Order in light of the commencement of the Main Case, but it is settled law that the ultimate determination on the applicability and scope of the automatic stay belongs to the Court. *See Suedkamp*, 578 S.W.3d at 416 (Missouri state courts will defer to the bankruptcy courts or bifurcate their proceedings when bankruptcy proceedings are implicated); *see also*

*Crowley*, 715 S.W.2d at 938. *See also Eastern Equip. & Servs. Corp. v. Factory Point Nat'l Bank*, 236 F.3d 117, 121 (2d Cir. 2001) (the Bankruptcy Code preempts questions of automatic stay violation). *See also Mokuba v. Pitts (In re Pitts)*, Case No. 08-74860, Adv. Proc. No. 09-8320, 2009 WL 4807615 (Bankr. E.D.N.Y. 2009) (the Supremacy Clause authorizes that a bankruptcy court holds the power to enforce its own injunctions). Therefore, the Court cannot give deference to any testimony that implies there should be no stay violation or that all activities that took place at the February 4, 2019 Hearing were within the jurisdiction of the State Court alone.

Unlike the debtor in *Lowery*, the Debtor here gave no testimony that he only filed bankruptcy to avoid the State Court's authority and punishment. 292 B.R. at 651. The Debtor here gave testimony that he was broke and out of options. The Debtor's previous attempts to seek in forma pauperis status with the State Court, whether or not it was successful, support the statement that the Debtor believed he was broke. Moreover, the Court need not ignore its own record, which clearly shows the Debtor was insolvent on the Petition Date. The Debtor, in this Adversary Proceeding and the Main Case, also credibly testified that he believed the Real Estate was worth far more than the pre-Petition Date contract price. He believed a better price would put him in a better position. The Debtor used the emergency filing options authorized by federal statute, often called filing a "skeleton" or "barebones" petition. This gave the Debtor an additional fourteen days to get the information to his Bankruptcy Counsel. There is nothing inappropriate given the circumstances of using this mechanism, as it provides the breathing space contemplated by Congress. S. Rep. No. 95-989 at 54-55, H.R. Rep. No. 95-959 at 340. If the Defendants or anyone involved with the February 4, 2019 Hearing took issue with the Debtor's choices to pursue bankruptcy protection, the proper venue to air those thoughts is before this Court. The Debtor very well may be a difficult litigant and stubborn as a

donkey, but the Court finds the Debtor's testimony regarding his intentions on filing bankruptcy credible. Difficult and stubborn individuals are still entitled to the protections of the Bankruptcy Code, so long as there are no credible allegations of filing in bad faith brought before the Court.

The Court further observes that when the Trustee did in fact sell the Real Estate as part of the Main Case, the Real Estate did not garner a significantly different purchase price than the pre-Petition Date offers. The Debtor also contested the price the Trustee sought as well. Even though the Debtor's belief about the Real Estate value was mistaken, the Debtor genuinely believed in his valuation. The Real Estate sold over the Debtor's objection. However, other non-exempt assets of the Debtor not subject to the State Court's orders have also been sold, and those funds are available for the payment of the Debtor's obligations pursuant to the priority distribution schedule set forth by the Bankruptcy Code. The Court takes judicial notice of its own record, which clearly establishes the Debtor had other debts to marshal. Further, after the payment of the secured liens on the Real Estate, the priority distribution schedule pays the Former Spouse first among all other creditors, even before administrative claims. 11 U.S.C. § 507(a)(1). Any remaining arrearages remain non-dischargeable. 11 U.S.C. § 523(a)(5). The Debtor did not manage to shirk any duties or come out ahead by filing the Main Case.

If there are ever questions about the motivations about why debtors filed bankruptcy those do not belong in a state court. Those questions must be brought before this Court in a procedurally sound format for adjudication. The Main Case has continued to proceed with no allegations of bad faith filing brought before the Court. No evidence is before the Court that voluntarily filing bankruptcy, without a determination of bad faith from a bankruptcy court, is contemptuous under Missouri

law. Moreover, such evidence would likely run afoul of Eighth Circuit precedent that prohibits penalizing debtors for seeking the protections of the Bankruptcy Code. *Knaus*, 889 F.2d at 776. Yet, the deposition transcripts submitted, and the testimony produced at trial demonstrated that litigants and members of the state court bar alike are ignorant to the fact that penalizing people for filing bankruptcy is inappropriate. Which is exactly what the evidence suggests the Attorney presented to the State Court and the Order & Confinement meant: by voluntarily filing bankruptcy the Debtor committed contemptuous acts. An order that ignores the protections of the Bankruptcy Code and works as means to punish a debtor does nothing to protect a court's dignity. A facially invalid order does nothing to protect a court's dignity.

Next, the language of the Order & Confinement required the Debtor to pay the full amount due on the Pre-Petition Debt or otherwise purge his contempt. The Debtor had no assets to pay the full amount due, a fact acknowledged in the Order & Confinement when it referenced that the Debtor had filed bankruptcy and "transferr[ed] control of the Real Estate to the Federal Bankruptcy Court." The first option was an attempt to satisfy the Pre-Petition Debt with Estate property. 11 U.S.C. § 362(b)(2); *Daugherty*, 117 B.R. at 517; *Gianakas*, 112 B.R. at 741. Had the Debtor attempted to sell the Real Estate pursuant to the option he would have violated federal law. Even attempting to satisfy the Pre-Petition Debt, without identifying what non-Estate property the Debtor could have used was yet another impossibility. 11 U.S.C. § 362(b)(2)(B); *Bezoza*, 271 B.R. at 51; *Decision, Golan*, 3, ECF No. 40. Any funds the Debtor would have had access to would have been property of the Estate, and the Trustee would have had the right to unwind the transaction. The vague option of "otherwise purge" was not an option, because it did not give the Debtor a choice. The Debtor is not an attorney, and he did not know all of the mechanisms under which he could purge himself. Moreover, any purging language

33

in a contempt order is evidence of coercion to pay a debt. *Lowery*, 292 B.R. at 650, (citing *Rook*, 102 B.R. at 494). The fact that this purging language only offered to allow the Debtor to do impossible things, violate federal law, or a vague third other option, it is difficult to see how the Order & Confinement was anything other than coercive and designed primarily to require payment.

The Attorney drafted the language of the Order & Confinement, and therefore is presumed to have understood the legal impact of his language selection. The Attorney's efforts to collect on the Pre-Petition Debt resulted in language deemed facially invalid, and the entire Order & Confinement was vacated by the Missouri Court of Appeals. The problems noted by the Order of Vacatur and the Order of Vacatur's impact are strong evidence that the Order & Confinement was designed to coerce payment of the Pre-Payment Debt and at least in part penalize the Debtor for seeking the protections of the Bankruptcy Code.

Further, it is inappropriate to allow the Defendants to argue that their intentional collection efforts grounded in a mistaken belief that the automatic stay did not apply should shield them from liability. It is also contrary to law. *Peralta*, 317 B.R. at 389; *Campion*, 294 B.R. at 316; *Risner*, 317 B.R. at 835; *see also Suedkamp*, 578 S.W.3d at 416; *see also Crowley*, 715 S.W.2d at 938. The old adage 'ignorance of the law is not a defense' wins the day. These Defendants had multiple opportunities to cease or reduce the violations, but they chose to move forward with their collection efforts.

The Court **FINDS** that the Order & Confinement cannot meet the *Lowery* exception, because the Order & Confinement worked as a means to punish the Debtor at least in part for commencing the Main Case; the Order & Confinement

34

contained explicit purge language; the Order & Confinement was vacated by the Court of Appeals for being facially invalid.

The Court **FINDS** the totality of the circumstances demonstrate that the main purpose of the February 4, 2019 Hearing and the Order & Confinement were to coerce payment of the Pre-Petition Debt.

The Court **FINDS** the February 4, 2019 Hearing and the Order & Confinement that issued after the February 4, 2019 Hearing were not excepted from the automatic stay.

The Court **FINDS** the Defendants asserted no valid statutory or non-statutory defenses to the violations of the automatic stay.

4. *The February 4, 2019 Hearing and Order & Confinement Were Void Ab Initio Acts Taken in Violation of the Automatic Stay*

The Court now turns to the impact that the Defendants' post-Petition Date collection efforts have on the Debtor's claim for a stay violation.

It has long been held in our circuit that any collection effort taken in violation of the automatic stay is void *ab initio*. *Vierkant*, 240 B.R. at 325. The February 4, 2019 Hearing continued the State Court Action as a collection effort for the Pre-Petition Debt. "[A]ll collection efforts" include any action or inaction designed to coerce payment from the Debtor, because the coercion destroys the breathing space required by Congress. S. Rep. No. 95-989 at 54-55, H.R. Rep. No. 95-959 at 340. These collection efforts violate the automatic stay. Therefore, the entirety of the February 4, 2019 Hearing, as its primary purpose was to coerce payment was void *ab initio*, even though it occurred as part of a judicial proceeding. *Kalb*, 308 U.S. at

439; *Interstate Com. Comm'n*, 931 F.2d at 987; *Vierkant*, 240 B.R. at 325. The Order & Confinement was void *ab initio* by its own terms by seeking to make progress on the collection effort for the Pre-Petition Debt and explicitly demanding full payment of the Pre-Petition Debt—with full knowledge that any funds would be property of the Estate—in exchange for Debtor's freedom from incarceration.

As the Court determined that the stay was in effect when the collection efforts took place, and the Defendants asserted no exceptions as to why these collection efforts are not subject to the automatic stay, the answer is clear.

Holding the February 4, 2019 Hearing with the purpose to move forward on the collection efforts for the Pre-Petition Debt was a void *ab initio* act. Incarcerating the Debtor as a consequence of non-payment of the Pre-Petition Debt and the February 4, 2019 Hearing was a void *ab initio* act. Both situations were designed to make progress on the collection efforts for the Pre-Petition Debt through coercion.

The Court **FINDS** the collection efforts to coerce payment on the Pre-Petition Debt in the State Court Action at the February 4, 2019 Hearing and through the Order & Confinement were void *ab initio*.

The Court **FINDS** that holding the February 4, 2019 Hearing to progress on the collection efforts for the Pre-Petition Debt violated the automatic stay.

The Court **FINDS** the Order & Confinement and all collection efforts taken pursuant to the Order & Confinement including the incarceration of the Debtor violated the automatic stay.

36

### D. The Defendants Had an Affirmative Duty to Prevent the Confinement of the Plaintiff

Now the Court turns to the question of the willfulness of the Defendants' collection efforts. Post-Petition Date the Former Spouse, a creditor and her agent, the Attorney, moved forward with their collection efforts on the Pre-Petition Debt. The Defendants' status as a creditor and a creditor's agent trigger responsibilities under the Bankruptcy Code. Therefore, they are governed by its provisions beginning on the Petition Date. Suggestions of Bankruptcy indicating the Main Case's commencement were filed on the Petition Date with the State Court. The Bankruptcy Counsel called the Attorney and left a voice message regarding the Main Case on the Petition Date. The Attorney states that he did not learn actually about the Main Case until right before the start of the February 4, 2019 Hearing, and the Attorney only took the word of the Bankruptcy Counsel as an officer of the court.

If the Defendants were unclear as to their obligations under the Bankruptcy Code, as creditors required to comply with the automatic stay by federal law, they had an obligation to seek clarification from the Court supervising the Main Case. *McComb*, 336 U.S. at 191-92. The automatic stay obligations are not subject to the fair ground of doubt standard discussed in *Taggart*. 139 S.Ct. at 1804. The Bankruptcy Code sets out statutory obligations, and violations of these obligations are judged by their willfulness. 11 U.S.C. § 362(k); *Ketelsen*, 880 F.2d at 993. This conclusion is not altered just because the Defendants used the State Court to pursue their collection efforts of the Pre-Petition Debt.

The February 4, 2019 Hearing occurred, and the Attorney attended. The Defendants, with full knowledge of the Main Case requested no continuance during the February 4, 2019 Hearing; the Defendants requested no dismissal of proceedings.

The state court judge called and heard the Former Spouse's Second Motion for Contempt, even after the Attorney received a variety of information regarding bankruptcy obligations from the Debtor. At the conclusion of the February 4, 2019 Hearing, the Debtor was ordered into the custody of St. Louis County, for failure to pay the Pre-Petition Debt, and, at least in part, because the Debtor filed bankruptcy. The plain language of the Order & Confinement makes this clear that by "transferr[ing] control of the Real Estate to the Federal Bankruptcy Court" the State Court viewed the Debtor's use of the bankruptcy protections as a problematic and contemptuous decision. Such a response to the Main Case violated the automatic stay.

A formal and automated notice went out to creditors on February 6, 2019. The Debtor was in the custody of St. Louis County from February 4, 2019 until February 8, 2019. For days, the Defendants, a creditor and a creditor's agent, willfully ignored the deprivation of liberty they caused, by failing to understand their obligations the moment the automatic stay came into effect.

The Defendants ask the Court to believe that they had no control over a proceeding to incarcerate the Plaintiff for civil contempt, and the Defendants ask the Court to believe that they were passive observers to the actions of the state court judge, which were all beyond the Defendants' control. However, the Court sees no evidence that the actions taken by the state court judge were *sua sponte*. The February 4, 2019 Hearing and resulting incarceration occurred as a direct result of the Defendants' decision to move forward on the collection efforts of the Pre-Petition Debt. The Defendants did not do everything within their power to "halt" the collection efforts of the Pre-Petition Debt. *O'Connor*, 42 B.R. at 392. The Defendants do not even allege that they attempted to halt the collection efforts.

38

The Defendants point to the Debtor's Determination Motion which alleged the Order & Confinement was in fact the violation of the automatic stay and the state court judge was the violator. However, this is a red herring. In its Denial Order, the Court discussed that the Determination Motion made procedurally improper requests, observed applicable bankruptcy law, and clarified several points. The state court judge did not meet the statutory definition of an "entity" for the purposes of violations of the automatic stay. Further, in its Denial Order, the Court clearly indicated that it is not a judge that commences or continues prosecution of a legal action; a judge serves as an adjudicator. The Court also clarified that it had no authority to order the State Court to set aside any Order & Confinement and release the then-still confined Debtor, no matter how the Court viewed the State Court's decision. The Court needed the issues brought before the Court in a procedurally sound manner. However, as discussed earlier, the Court of Appeals *did* set aside the Order & Confinement as facially invalid and ordered the Debtor's release stating the incarceration was contrary to the law.

The Defendants argue that by filing that Determination Motion and having it denied, and now commencing the instant Adversary Proceeding, the Debtor has somehow misled the Court. The Court is not so naïve. No prejudice or undue delay has occurred as a result of the Debtor's initial mistake in misidentifying the at-fault party. Identifying the wrong party responsible for violations of the automatic stay happens, and there are mechanisms to resolve the differences. In this Adversary Proceeding, the Court does not view what the Debtor did as an issue. In the Determination Motion, the Debtor alleged sufficient facts that put the Court and all of the other Parties on notice that the Former Spouse's Second Motion for Contempt led to the Order & Confinement. These alleged facts included statements about the history of the Second Motion for Contempt, the type of debt at issue, and that the

Former Spouse's Second Motion for Contempt was called and heard after the Petition Date. The Determination Motion was summarily denied within days of its filing. The Court would also note that this Determination Motion was filed while the Debtor remained incarcerated. That fact certainly does not excuse the error in misidentifying the at-fault party, but when viewed with all of the other circumstances it is clear that there was never an attempt to mislead the Court about the fact a miscarriage of justice may have occurred. This Adversary Proceeding only commenced after the Determination Motion was denied, and the Court held a hearing in the Main Case to receive an update if the Main Case was moving forward. The Court notes, that the Attorney attended this hearing, so knowledge of the possibility of future proceedings regarding the stay violations were possible.

The adjudications of the state court judge are not the issue before the Court. The issue is the Defendants' failure to behave in a way befitting a creditor and its agent bound by federal law to comply with the automatic stay. Neither Defendant presented evidence that either Defendant even attempted to dissuade the state court judge from the incarceration route.  Incarceration was requested in the Second Motion for Contempt! Additionally, the Court observes that the Attorney is required to present law to any tribunal that is binding even if it is detrimental to his client, the Former Spouse. MO. SUP. CT. R. 4-3.3. The Attorney's own testimony demonstrates that he knew little about the Bankruptcy Code, and in particular how the Bankruptcy Code enjoins many state debt collection efforts, including in domestic court. The Attorney failed to understand that just because a collection effort occurs under the umbrella of the State Court's domestic division, it does not invoke the exceptions to the automatic stay for the narrow domestic issues. The Attorney failed to present the federal law that implements the automatic stay at the moment of Main Case's commencement—whether or not the formal notice issues. 11 U.S.C. § 362(a);

*Garden*, 719 F.3d at 906; *see also Gruntz*, 202 F.3d at 1081; *see also Carter*, 502 B.R. at 336. He failed to present the federal law that prohibits the continuation of *any* attempt to coerce payment of a pre-petition debt absent narrowly construed exceptions. 11 U.S.C. § 362(b); *Armstrong*, 631 F.2d at 1351-52. He failed to present the federal law that reserves the right to lift the automatic stay for the federal system. 11 U.S.C. § 362(d). The Bankruptcy Code preempted the state court judge's authority to act under these facts, and the Attorney had an obligation to know this and present it.

Even if the State Court refused to accept the federal law as presented, the Attorney would have fulfilled his obligations of professional conduct.

If the Attorney presented evidence to the Court that he tried and failed to convince the State Court that it did not have the authority to act on the collection effort in the manner ordered until relief from the stay was sought, the Court might be persuaded to view this entire situation in a different light. But no such evidence exists.

What is before the Court is the Attorney's own testimony asking the Court to see that the Attorney chose to do nothing but watch the collection effort proceed. The Attorney attempts to argue that he could not do anything but stand and watch the collection efforts proceed. The Court does not accept this characterization. It was the Former Spouse's collection efforts under the Second Motion for Contempt before the State Court. The Former Spouse was the movant on the contempt motion requesting incarceration. The Attorney was her legal counsel hired to act appropriately and protect the Former Spouse and her interests. Yet, the Attorney alleges he could do nothing, because it was the right of the State Court to proceed as it saw fit. However, there is no authority cited anywhere in the Court's record for

41

this. As stated previously, there is no State Court record of the February 4, 2019 Hearing and certainly no authority to support the Attorney's position. What the Attorney did point to is the deposition testimony that was submitted indicating that the State Court sought to enforce its own prior orders. Yet, those prior orders are for collection of the Pre-Petition Debt, and the same testimony highlighted states that the Attorney affirmatively wished to move forward with the collection efforts.

The Court already is troubled with the usefulness of testimony centered on a facially invalid order and a fundamental misunderstanding of the Bankruptcy Code, and the Attorney does not improve his position by pointing to such testimony. The Attorney's argument is not supported by the "universal nature" of § 362. *Atkins*, 176 B.R. at 1006.

The Court views the Order & Confinement arising from the February 4, 2019 Hearing as the result of the Defendants' efforts to collect on the Pre-Petition Debt, and the state court judge agreed. In her deposition, the state court judge specified that the Attorney sought to proceed with the Order to Show Cause and proceed with the collection efforts.  Specifically, the movant has the burden of proof required to result in an order of contempt under Missouri law. *Ream-Nelson*, 333 S.W.3d at 28. How the Attorney met that burden is unclear to the Court, because the Attorney claims he did not put on evidence. However, no matter what the Attorney believed he represented to the State Court, the fact is that the February 4, 2019 Hearing proceeded. The state court judge in her deposition stated the Attorney affirmatively wished to proceed with the collection efforts. Under Missouri law, "'[c]ivil contempt is intended to benefit a party for whom an order, judgment or decree was entered.'" *Garner*, 17 S.W.3d at 929 (quoting *Chassaing*, 887 S.W.2d at 578). The resulting Order & Confinement hinged all on the Debtor's full payment of the Pre-Petition

Debt. If not for the collection efforts of the Defendants, the Order & Confinement never would have issued.

Those who were in the room where the February 4, 2019 Hearing happened have gone out of their way to present a conflicting and messy recitation of the circumstances. The Court of Appeals found the situation so unclear that the Order & Confinement—the fruit of the Defendants' post-Petition Date collection efforts—was rendered facially invalid. This invalidity does not absolve the collection efforts of the Defendants. The Debtor, a person, lost his liberty for days, because as best as the Court can tell, filing bankruptcy is contumacious in the eyes of the Defendants. If it was not, the Defendants would have steered the February 4, 2019 Hearing clear of such a ruling. The Court is not blind to the procedures available in the State Court. Requests for continuances are available. Requests for orders to be held in abeyance are available. Requests for dismissal without prejudice are available. None of these options occurred. The Defendants let the collection effort train barrel down the tracks. The Defendants did not even blow the train's whistle to alert the State Court about federal law concerns. So, justice got derailed. Yet, the Defendants ask the Court to believe they held no control over what happened.

The Court does not believe that argument.

The Attorney's client was victorious at the end of the February 4, 2019 Hearing and the Order & Confinement reflect that the primary purpose of the incarceration was to force payment of the Pre-Petition Debt. In keeping with an ordinary and customary practice of the local State Court, the state court judge had the Attorney—as the representative of the prevailing creditor—to draft the handwritten Order & Confinement. The language of the Order & Commitment was not objected to by the Former Spouse or the Attorney. There is no indication from

43

any of the evidence that either Defendant thought the Order & Commitment was inappropriate or out-of-line. However, the plain language of the Order & Commitment indicates that the incarceration occurred, at least in part, as a punishment for the Debtor filing the Main Case, which had the consequence of preventing the sale of the Real Estate. The purge language made the Debtor's freedom contingent upon payment of the Pre-Petition Debt, which on its own, other bankruptcy courts have found violated the automatic stay protections. *Decision, Golan*, 3, ECF No. 40.

The state court judge signed the Order & Confinement. The Defendants ask the Court to believe that such collection efforts are not affirmative acts in violation of the automatic stay, however, the Court is not a believer in fairy tales. The Defendants set the collection efforts in motion. *Mitchell*, 66 B.R. at 75; *Dennis*, 17 B.R. at 559-60. The Former Spouse is the creditor that benefits from the collection efforts on the Pre-Petition Debt. The Attorney is her agent. The Attorney filed the necessary pleadings to pursue efforts to collect on the Pre-Petition Debt pre-bankruptcy. Post-Petition Date, the Attorney attended the February 4, 2019 Hearing, which continued to apply pressure on the Debtor regarding the Pre-Petition Debt. The Attorney affirmatively stated and reduced to writing in the Order & Confinement that the Defendants understood the Trustee, under authority of the Bankruptcy Code, controlled the Real Estate. The Attorney specified that by filing bankruptcy the Debtor "transfer[ed] control of the [Real Estate] to the Federal Bankruptcy Court." The Attorney, committed to writing via his drafting of the Order & Confinement, a post-Petition Date demand for payment of the Pre-Petition Debt, and abhorrently, the Debtor's freedom from incarceration was contingent on payment. In the eyes of the Bankruptcy Code, these efforts constitute post-Petition Date "acts." However, these were not acts that stopped the collection effort train.

44

Yet, if the Attorney is to be believed, he did nothing. He alleges that he allowed a collection effort—one he put into motion—to incarcerate the Debtor without raising any sort of objection. The Attorney thinks this absolves him. If the Attorney is to be believed, this is worse. He is asking the Court to view his shirking of the affirmative duty to control a collection effort in a responsible manner, as mandated by federal law and recognized for decades by this Circuit, as excusable. *Knaus*, 889 F.2d at 775; *Wohleber,* 596 B.R. at 572; *Elder*, 12 B.R. at 494; *Dungey*, 99 B.R. at 817. The Court cannot do such.

A creditor, who has put a collection effort into motion *must* affirmatively act to stop, stay, or hold the collection effort in abeyance or risk incurring liability once a bankruptcy commences. *Knaus*, 889 F.2d at 775; *Wohleber,* 596 B.R. at 572; *Dougherty-Kelsay*, 601 B.R. at 448; *Atkins*, 176 B.R. at 1006; *O'Connor*, 42 B.R. at 392. An attorney for a creditor *must* familiarize himself or herself with the Bankruptcy Code sufficient to recognize when time is needed to avoid risking liability. An attorney *must* be willing to present federal law that binds a state court from taking action, even if the action is the very thing that attorney previously requested. *Wohleber*, 596 B.R. at 572; *Dougherty-Kelsay*, 601 B.R. at 448; *Elder*, 12 B.R. at 494. To return to the train analogy, the creditor cannot ignore a runaway train that the creditor set into motion and to do so would be "patently absurd." *Dungey*, 99 B.R. at 817.

Here, if the Defendants were unsure if the automatic stay applied to their situation, they had options. On the bankruptcy front, the Defendants could have requested an expedited hearing with the Court for clarification on the automatic stay or moved for relief from the stay. With the State Court, the Defendants could have asked for continuances, dismissals, or orders held in abeyance. The Attorney could

45

have asked to make a more substantial record if the Attorney genuinely believed he had no control over the proceedings. The Attorney could have refused to draft the Order & Confinement. The Attorney could have at least requested time to phone a friend who might have known more about bankruptcy. However, the Defendants instead chose to allow an injustice to take place. This is not just this Court's determination. The Court of Appeals found the State Court's Order & Confinement, drafted by the Attorney, facially invalid and found the Debtor's incarceration contrary to law. The Order of Vacatur noted that nowhere in the Order & Confinement had the State Court made a finding indicating how the Debtor could purge the contempt absent payment from Estate property.

This Court is faced with the issue of if a creditor exercises control over a debtor's liberty, contingent on the payment of pre-petition debt, does that willfully violate the automatic stay? The answer in the instant Adversary Proceeding must be yes. The Defendants held the control. If the Defendants truly did not want the collection effort to move forward against the Debtor, or the incarceration of the Debtor to happen, they had the ability to stop it, or at the very least, lodge enough of a dispute to make the State Court question the appropriateness of incarceration at that time. The Court of Appeals recognized that the "key to the jailhouse door" was never in the Debtor's pocket under the finding of contempt put forth by the Order & Confinement; this violated Missouri law. *C.S.G.*, 559 S.W. 3d at 422 (quoting *Barth*, 870 S.W. 2d at 459). The Court views those keys were in fact held by the Defendants who allowed the collection effort to proceed in flagrant disregard for the federal laws protecting the Estate and the Debtor.

Unlike the ex-spouse and attorney in *Wohleber*, who worked with the debtor to secure his release and hold the contempt in abeyance until the completion of the

bankruptcy, here, the Defendants exercised no remedial efforts to rectify their violations. 596 B.R. at 562. There is no evidence that the Defendants supported the Debtor's efforts to be released from the custody of the state, nor is there evidence that they worked in tandem to reach an agreement to hold any collection efforts in abeyance.

The Court understands the frustration the Former Spouse feels at being admonished for her collection efforts of a non-dischargeable debt but that is exactly the point. She was seeking to *collect a pre-petition debt* after the Main Case commenced from property of the Estate. She is not above the law. Moreover, the Former Spouse cannot escape liability for the actual damages that arose from the Attorney's legal advice and collection efforts on her behalf. *Ketelsen*, 880 F.2d at 993; *Heghmann*, 316 B.R. at 406; *Daniels*, 316 B.R. at 352.

The Court understands the frustration the Attorney feels at being held responsible for acting on his client's behalf at the February 4, 2019 Hearing. However, the Attorney was an agent of the collection effort and equally culpable for the violation. *Gray*, 567 B.R. at 843; *see also Bailey*, 428 B.R. at 700. Moreover, his collection efforts including affirmatively asserting to proceeding with the February 4, 2019 Hearing and drafting the Order & Confinement exposed his client to liability. The Attorney also possessed specialized legal knowledge that he should have used, but he did not. The stay applies to the collection efforts of an attorney the same as it does to a client. 11 U.S.C. § 362(a). He is also not above the law.

Neither Defendant sought relief from the stay prior to the February 4, 2019 Hearing. Neither Defendant sought to annul the stay after the February 4, 2019 Hearing. Neither Defendant sought to strip the Debtor of the protection of the Bankruptcy Code through allegations of a bad faith filing properly brought before

the Court. The Attorney produced no evidence of mitigating factors for the Court to believe that the collection efforts he took were anything less than willful. The collection efforts were targeted at the Debtor and designed to coerce him into paying the Pre-Petition Debt from property of the Estate, or under the terms of the facially invalid Order & Confinement. The collection efforts and consequences were clear. The Debtor was going to remain incarcerated, because of the collection efforts of the Defendants, until the Debtor bowed to their wishes.

Their wishes? Full payment of Pre-Petition Debt.

The Court **FINDS** the Defendants willfully violated the automatic stay by choosing to move forward on the collection efforts for the Pre-Petition Debt after the commencement of the Main Case.

The Court **FINDS** that the Defendants had an affirmative obligation to halt all the collection efforts on the Pre-Petition Debt the Defendants put into motion including the February 4, 2019 Hearing and the incarceration under the Order & Confinement.

The Court **FINDS** that the Defendants took no affirmative actions to halt all the collection efforts on the Pre-Petition Debt the Defendants put into motion including the February 4, 2019 and the incarceration under the Order & Confinement.

The Court **FINDS** that by not assisting in the release of the Debtor from incarceration, the Defendants willfully violated the automatic stay.

The Court **FINDS** that by not taking any remedial steps to remedy their violations of the automatic stay the Defendants' continued to willfully violate the automatic stay until February 8, 2019.

### E. The Defendants are Liable for Damages to the Debtor

#### 1. *Actual Damages*

The Court now moves to the issue of whether the violations of the automatic stay caused the Debtor actual damages. 11 U.S.C. § 362(k); *Garden*, 719 F.3d at 906-07. Evidence for each genuine injury claimed must be part of the evidentiary record. *Forshee*, 178 F.3d at 531. Emotional distress damages "require proof of evidence of the nature and extent of emotional harm caused by the alleged violation." *Browning*, 139 F.3d at 636.

The Debtor missed four days of ordinary employment for which he would have worked at least eight hours a day and made $10.00 an hour. The Debtor also testified that he regularly drove for Uber, and his share of the fares generally resulted in approximately $50.00 a day. The Debtor also alleged that he missed potential overtime, but this allegation is not credible, due to a lack of evidence in the record.

The Debtor also testified about emotional distress, embarrassment, and pain the Debtor has suffered due to the incarceration. The Court believes the Debtor's testimony regarding the emotional distress about being incarcerated and fears about the impact on his job. The Court believes the Debtor was emotionally distressed, and the Court believes that the Debtor felt he was being tossed in a "debtor's prison" inappropriately. However, the Debtor here was not a business owner left without his blood pressure medication, diabetes medication, or deprived of hours of access to his C-PAP machine left wide awake with fears about dying in his sleep, unlike *In Re*

49

*Goodson*. Case No. 17-41820, 2018 WL722461, *1, *6, *13 (Bankr. N.D. Ala. Feb. 5, 2018). The debtor in *Goodson* complained during incarceration about his medical care only to be told, "You're not dying," which the court there found abhorrent and awarded emotional and physical distress damages in the amount of $5,000 a day. *Id.* Also, there was no testimony or evidence produced that the Defendants also harassed his loved ones post-Petition Date to force the Debtor into incarceration, unlike *In re Bishop*, which resulted in an emotional damages award of $5,000.00. 296 B.R. 890, 897 (Bankr. S.D. Ga. 2003). The evidence produced regarding the emotional distress was limited to the Debtor's testimony, and the Court cannot view the extent of the distress beyond such testimony.

Further, the Court does not find the Debtor's testimony credible that he intentionally refused to discuss pain with a medical professional in late March 2019—following a post-incarceration car accident—that the Debtor claimed was caused by the bed during the incarceration six weeks prior. The Debtor claimed that he was simply too embarrassed to explain such a thing, but the Court views that statement as too convenient.

The Court **FINDS** actual damages did occur as a result of the stay violations.

The Court **FINDS** both Defendants are jointly and severally liable for the actual damages.

The Court **FINDS** that the Debtor suffered a loss of income in the amount of **$520.00** as a result of the stay violations.

The Court **FINDS** the evidence does not support the claim for medical expenses. The Court further **FINDS** that no actual damages arose for medical issues due to the incarceration.

The Court **FINDS** that some emotional distress did occur from the Debtor's incarceration, however, the limited evidence supports a finding that the emotional harm was limited. The Court **FINDS $400.00** ($100.00 for each night of incarceration) is a reasonable value based on the limited evidence of the Debtor's emotional distress related to the violations of the automatic stay.

The Debtor also incurred new debt, right after filing bankruptcy, to his father, John Valentine (the "Debtor's Father"). The Debtor had to obtain special legal counsel to assist with filing the necessary writ to seek his freedom from improper incarceration. The Debtor's Father, paid Nathan S. Cohen, Attorney At Law $5,974.00 for the work of Cohen ($4,584.00) and the work of two employees ($1,320.00) plus costs ($70.00) associated with freeing the Debtor from incarceration. This is an actual damage, because it was a cost incurred as a direct result of the stay violation.

Contrary to the Defendants' argument, the Court views the Debtor's employment of counsel to file the writ and have the Order & Commitment vacated as an effort to mitigate his damages. Moreover, the Court also views the Debtor's decision to file the Determination Motion with this Court as a misguided attempt to mitigate his damages. In the Court's discretion, the attorneys' fees incurred associated with the Determination Motion will not be awarded, because the Bankruptcy Counsel should have known the improper party was identified in the Determination Motion.

However, the Debtor, is entitled to recover the attorneys' fees and costs he incurred bringing this Adversary Proceeding. 11 U.S.C. § 362(k). In the order entered in conformity with this Opinion, the Court will set an evidentiary hearing to

consider the amount of reasonable attorneys' fees and costs recoverable as actual damages.

The Court **FINDS** the Debtor incurred attorneys' fees and costs in bringing this Adversary Proceeding as an actual damage directly related to the violations of the automatic stay.

The Court **FINDS** the amount of **$5,974.00** paid to Nathan S. Cohen, Attorney-At-Law for assistance in seeking the Debtor's release from incarceration reasonable. The Court **FINDS** the Debtor's Father paid this amount on the Debtor's behalf. The Court **FINDS** the Debtor incurred debt to the Debtor's Father as an actual damage directly related to the violations of the automatic stay.

2. *Punitive Damages*

As the Debtor seeks sanctions against the Defendants, the Court will now look at the question of punitive damages. Punitive damages are recoverable in "appropriate circumstances" which mandate egregious, deliberate, or intentional misconduct by the violating creditor or his or her agent. *Ketelsen*, 880 F.2d at 993. A court must also consider the creditor's ability to pay and the nature's misconduct when setting the amount of punitive damages. *Armstrong*, 631 F.2d at 1351-52.

The Attorney is a Missouri barred attorney. Therefore, he is governed by the Missouri Supreme Court Rules Governing Professional Conduct. By the Attorney's own testimony, he is well-versed in these rules. The Court views professional responsibility of all attorneys as a serious matter. Rule 4.1-1 Comment 5 states in part "[c]ompetent handling of a particular matter includes inquiry into and analysis of the factual and legal elements of the problem and use of methods and procedures meeting the standards of competent practitioners." MO. SUP. CT. R. 4.1-1 Comment

5. The State Court Action required some knowledge regarding bankruptcy, once the Main Case was filed. Even recognizing the current Missouri state case law—such as *Suedkamp*—would have been helpful, but the Attorney did not even utilize that resource. 578 S.W.3d at 416. If the Attorney had followed these guidelines it is unclear if the facts leading to the incarceration would have ever occurred. However, the Attorney made no attempt to familiarize himself with the Bankruptcy Code, the automatic stay, the Missouri case law, or the impact the Suggestions of Bankruptcy actually had on continuing to pursue the Pre-Petition Debt. Therefore, the Court can find no evidence to refute the assertion that the Attorney egregiously violated the automatic stay by participating in post-Petition Date collection efforts that resulted in the incarceration of the Debtor.

The Court opts to assess that the egregious acts resulting in the willful violations supporting punitive damages only against the Attorney. *Ketelsen,* 880 F.2d at 993. The Attorney was the one with specialized knowledge of the law. The Attorney was the one who failed in his professional conduct obligations to be candid to the State Court. The Attorney was the one who had a duty to be competent in federal law as well as state law when the risk of not being competent put his client at risk for liability. The Attorney avoided creating a clear record or asking for an abeyance of the ruling of the State Court. The Attorney stated that he intentionally stood aside without properly using all of the appropriate State Court remedies to prevent the improper incarceration of the Debtor. Then when a ruling came down in favor of the Former Spouse on the collection efforts the Attorney deliberately drafted the language of the Order & Confinement, which highlighted the coercive nature of the incarceration, designed to force the payment of the Pre-Petition Debt. The language of the Order & Confinement blamed the commencement of the Main Case, at least in part, for the Debtor's incarceration. The language of the Order &

Confinement asserted the commencement of the Main Case was contemptuous. The Court understands the Debtor's abhorrence and embarrassment at the idea that the Debtor was effectively thrown in a debtor's prison. It is not hard to see where that feeling would have originated.

While the Attorney expressed embarrassment and some shame at being unaware at the broad scope of the automatic stay, his mistake was still egregious and disheartening to the Court. He hid behind his ignorance, and he hoped his assertions that he only passively participated in the collection efforts would shield him.

The Former Spouse on the other hand did not attend the February 4, 2019 Hearing. Much like the creditor in *Ketelsen*, following the advice of counsel, without something more is only sufficient to hold the creditor liable for actual damages— not punitive damages. 880 F.2d at 993. She did not draft the Order & Confinement. She does not have specialized legal knowledge. While she might have known that incarceration was possible after the February 4, 2019 Hearing, no evidence was presented that she even knew what options existed after the Debtor was incarcerated. She relied on the Attorney's advice, which resulted in a willful violation of the automatic stay and actual damages on her part, and actual and punitive damages on the part of the Attorney.

The Court **FINDS** there were not appropriate circumstances surrounding the Former Spouse's actions sufficient to assess punitive damages payable by the Former Spouse to the Debtor.

As the Attorney stated that he works almost exclusively in domestic law, there is a large opportunity for the Attorney to run afoul of the Bankruptcy Code again. Much of what led to the instant Adversary Proceeding is a misunderstanding of the

binding federal law on the very narrow exception to the automatic stay for domestic matters. The Attorney testified he had only had a meager number of cases over the years that had bankruptcy implications. Yet, the Attorney's self-professed bankruptcy ignorance has put an unknown number of other clients—and himself— at risk of incurring liability due to violations of the Bankruptcy Code. The Court views this same ignorance as a hurdle preventing the Attorney from being able to objectively identify the risk to himself or his clients. The Court must consider what would act as a deterrent to such willful ignorance in the future when assessing punitive damages. *Armstrong*, F.2d at 1351-52. The Attorney's genuineness in his expressions of embarrassment gives the Court hope that the Attorney will take the initiative and familiarize himself with the Bankruptcy Code through continuing legal education, including courses focused on bankruptcy ethics and proper creditor behavior going forward. However, this hope will not replace all monetary amounts.

The Court **FINDS** the Attorney's actions were willful, deliberate, and intentional resulting in the appropriate circumstances to assess punitive damages payable by the Attorney to the Debtor. The Court **FINDS $1,000.00** an amount reasonable to assess against the Attorney for punitive damages as a means to deter future willful violations of the Bankruptcy Code.

## V. CONCLUSION[*]

The Debtor seeks a declaratory judgment that the Defendants violated the automatic stay, damages for his out-of-pocket costs associated with freeing himself from the custody of St. Louis County, attorney fees, and sanctions against the Defendants.

---

[*] The Court would like to thank law student interns Michael Crawford, Timothy Schweiss, and Brett Weber for their assistance with this Opinion.

The Court cautions the Parties about attempting to make any special backroom deals to resolve this issue. Any award of damages to the Debtor *cannot* be offset against the arrearage, the Pre-Petition Debt, or future domestic support obligations owed to the Former Spouse. In the state of Missouri, child support is not a negotiating tool to be toyed with in such a way, and the Court recognizes that fact. Any domestic support modification must go through the State Court. Any damages for violations of the Bankruptcy Code go through the federal court.

Further, the Court cautions the Parties regarding using the resolution of the instant Adversary Proceeding as a means to belittle and harass one another moving forward. The Court is not going to tolerate further disrespect to the judicial process, and it will not allow its orders to be used as a means to abuse others.

If the Court becomes aware of such behavior, it will refer all offending parties to the appropriate governing authorities and courts for appropriate actions.

The Court **FINDS** in favor of the Debtor that both the Former Spouse and the Attorney willfully violated the automatic stay, and therefore the Court will enter a separate Order and a separate Judgment in favor of the Debtor in conformity with this Opinion.

The Court **FINDS** that the *Rooker-Feldman* doctrine does not apply to the Adversary Proceeding before it.

The Court **FINDS** the Order & Confinement never became final, because the Court of Appeals overturned the rulings and ordered its vacatur.

The Court **FINDS** it is not precluded from ruling on the issue of if there was a violation of the automatic stay by any determination made in the Order & Confinement.

The Court **FINDS** that the automatic stay went into effect immediately upon commencement of the Main Case on February 1, 2019.

The Court **FINDS** that the collections efforts of the February 4, 2019 Hearing and under the Order & Confinement took place while the automatic stay was in effect.

The Court **FINDS** the exception to the automatic stay of § 362(b)(1) does not apply, because the February 4, 2019 Hearing was not a criminal contempt proceeding.

The Court **FINDS** the exceptions to the automatic stay of § 362(b)(2)(A) do not apply, because the domestic support obligations had already been determined to be the Pre-Petition Debt, and the Debtor's last pre-Petition Date modification request with the State Court had already been denied. No other evidence was put before the Court to allege the other exceptions under this section might apply.

The Court **FINDS** that the February 4, 2019 Hearing and Order & Confinement sought payment of the Pre-Petition Debt through Estate property.

The Court **FINDS** that the actions taken at the February 4, 2019 Hearing and under the Order & Confinement violated the automatic stay, because the exception under § 362(b)(2)(B) cannot apply when the State Court fails to specifically identify non-Estate property available for payment of the Pre-Petition Debt.

The Court **FINDS** that the exception to the automatic stay of § 362(b)(2)(C) does not apply, because there is no evidence before the Court indicating that the February 4, 2019 Hearing or the Order & Confinement involved a withholding order or a garnishment order.

The Court **FINDS** that no statutory exception to the automatic stay applies to the collection efforts taken by the Defendants relating to the February 4, 2019 Hearing and the Order & Confinement.

The Court **FINDS** that the Order & Confinement cannot meet the *Lowery* exception, because the Order & Confinement worked as a means to punish the Debtor at least in part for commencing the Main Case; the Order & Confinement contained explicit purge language; the Order & Confinement was vacated by the Court of Appeals for being facially invalid.

The Court **FINDS** the totality of the circumstances demonstrate that the main purpose of the February 4, 2019 Hearing and the Order & Confinement were to coerce payment of the Pre-Petition Debt.

The Court **FINDS** the February 4, 2019 Hearing and the Order & Confinement that issued after the February 4, 2019 Hearing were not excepted from the automatic stay.

The Court **FINDS** the Defendants asserted no valid defenses statutory or non-statutory to the violations of the automatic stay.

The Court **FINDS** the collection efforts to coerce payment on the Pre-Petition Debt in the State Court Action at the February 4, 2019 Hearing and through the Order & Confinement were void *ab initio*.

58

The Court **FINDS** that holding the February 4, 2019 Hearing to progress on the collection efforts for the Pre-Petition Debt violated the automatic stay.

The Court **FINDS** the Order & Confinement and all collection efforts taken pursuant to the Order & Confinement including the incarceration of the Debtor violated the automatic stay.

The Court **FINDS** the Defendants willfully violated the automatic stay by choosing to move forward on the collection efforts for the Pre-Petition Debt after the commencement of the Main Case.

The Court **FINDS** that the Defendants had an affirmative obligation to halt all the collection efforts on the Pre-Petition Debt the Defendants put into motion including the February 4, 2019 Hearing and the incarceration under the Order & Confinement.

The Court **FINDS** that the Defendants took no affirmative actions to halt all the collection efforts on the Pre-Petition Debt the Defendants put into motion including the February 4, 2019 and the incarceration under the Order & Confinement.

The Court **FINDS** that by not assisting in the release of the Debtor from incarceration, the Defendants willfully violated the automatic stay.

The Court **FINDS** that by not taking any remedial steps to remedy their violations of the automatic stay the Defendants' continued to willfully violate the automatic stay until February 8, 2019.

The Court **FINDS** actual damages did occur as a result of the stay violations.

59

The Court **FINDS** both Defendants are jointly and severally liable for the actual damages.

The Court **FINDS** that the Debtor suffered a loss of income in the amount of **$520.00** as a result of the stay violations.

The Court **FINDS** the evidence does not support the claim for medical expenses. The Court further **FINDS** that no actual damages arose for medical issues due to the incarceration.

The Court **FINDS** that some emotional distress did occur from the Debtor's incarceration, however, the limited evidence supports a finding that the emotional harm was limited. The Court **FINDS $400.00** ($100.00 for every night of incarceration) is a reasonable value based on the limited evidence of the Debtor's emotional distress related to the violations of the automatic stay.

The Court **FINDS** the Debtor incurred attorneys' fees and costs in bringing this Adversary Proceeding as an actual damage directly related to the violations of the automatic stay.

The Court **FINDS** the Debtor incurred debt to the Debtor's Father as an actual damage directly related to the violations of the automatic stay. The Court **FINDS** the amount of **$5,974.00** paid to Nathan S. Cohen, Attorney-At-Law for assistance in seeking the Debtor's release from incarceration reasonable. The Court **FINDS** the Debtor's Father paid this amount on the Debtor's behalf.

The Court **FINDS** there were not appropriate circumstances surrounding the Former Spouse's actions sufficient to assess punitive damages payable by the Former Spouse to the Debtor.

The Court **FINDS** the Attorney's actions were willful, deliberate, and intentional resulting in the appropriate circumstances to assess punitive damages payable by the Attorney to the Debtor. The Court **FINDS $1,000.00** an amount reasonable to assess against the Attorney for punitive damages as a means to deter future willful violations of the Bankruptcy Code.

DATED:  January 17, 2020
St. Louis, Missouri 63102
mtc

CHARLES E. RENDLEN, III
U.S. Bankruptcy Judge

Copy Mailed To:

**Andrew R Magdy**
2700 Macklind Avenue
St. Louis, MO 63139

**Jody K Valentine**
747 Castle Tower Dr.
Ellisville, MO 63021

**Christine Valentine**
51 Waterside Drive
Apt C
Wildwood, MO 63040

**Greg A. Luber**
501 First Capitol Drive
St. Charles, MO 63301

**Eric Wulff**
501 Capital Drive #2
St Charles, MO 63301

**Jeffrey R. Schmitt**
Danna McKitrick, P.C.
7701 Forsyth Blvd., Suite 800
St. Louis, MO 63105